**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————
MOHAMED SALEM EL-HADAD,      )
                            )
          Plaintiff,         )
                            )
     v.                      )    Civil Action No. 96-1943 (RWR)
                            )
THE EMBASSY OF THE UNITED    )
ARAB EMIRATES et al.,        )
                            )
          Defendants.        )
———————————————————)


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

        Plaintiff Mohamed Salem El-Hadad sued the United Arab
Emirates ("UAE") and its Washington, D.C. embassy for breach of
his employment contract and defamation after he was fired from
his position as internal auditor for alleged financial
improprieties.  El-Hadad asserts that the allegations were false
and that defendants defamed him when they made the allegedly
false accusations of impropriety.  The evidence presented by the
parties during a six-day bench trial established that defendants
breached the terms of El-Hadad's employment contract, that the
UAE defamed El-Hadad, and that El-Hadad is entitled to contract
damages and presumed general defamation damages.  These findings
of fact and conclusions of law explain that conclusion.

        BACKGROUND FINDINGS OF FACT

        The UAE government maintains a diplomatic mission and an
embassy in Washington, D.C. that includes a cultural division

-2-

headed by a cultural attache.  The cultural division answers, at
least in part, to the UAE Minister of Higher Education and
Scientific Research ("HESR").  The division administers a program
funded by the UAE that supports UAE citizens enrolled in colleges
in the United States.  During the time El-Hadad was auditor at
the embassy in the mid-1990s, there were between two thousand and
twenty-five hundred UAE students annually in the cultural
division's program, with annual program expenditures greater than
$50 million.

     El-Hadad, born in the summer of 1954, is an Egyptian citizen
fluent in Arabic but not in English.  He earned a bachelor's
degree in accounting in 1976 in Egypt and then served for three
years in the Egyptian military.  After being honorably discharged
from the military, he worked as an accountant in a hotel in
Alexandria, Egypt and then as an auditor with the Ministry of
Water.  In 1981, he moved to Abu Dhabi, the UAE capital city and
seat of government, to take a better paying position as a hotel
accountant.  He was quickly promoted to auditor of the hotel's
food and beverage department.  In 1982, he was hired by the UAE
government as a "local employee" to work in Abu Dhabi as an
auditor in the Ministry of Education, a position he held for the
next decade.  His job was to review and audit the expenses of the
cultural divisions of the UAE embassies worldwide which, at that
time, administered the college student support program sponsored

-3-

by the UAE government.  El-Hadad consistently received excellent
performance reviews in this position.

In the summer of 1992, while on vacation in the United
States, El-Hadad met with the Washington embassy's cultural
attache and his deputy and learned from them that the cultural
division needed an auditor.  They encouraged him to apply for the
position.  El-Hadad testified that he discussed the job
opportunity with them over the course of several weeks and that
they specifically told him the job was a permanent position.  He
decided to take the Washington position and resigned voluntarily
from his job in the UAE.  Upon his departure from the Ministry of
Education, he received a letter from the Assistant Under
Secretary attesting that in his work "auditing accounts of
Cultural Divisions of the UAE Embassies abroad . . . he was
serious and loyal towards his work."  (Pl.'s Ex. 3.)  In
addition, he received a letter from the Ministry of Education
certifying that "[h]is duties included auditing functions of the
Cultural Divisions located at our Embassies abroad, and he was an
exemplary employee who displayed seriousness and integrity."
(Pl.'s Ex. 4.)

El-Hadad began his employment in the Washington embassy's
cultural division in January 1993, pursuant to an express
authorization under Article 4 of the Local Employees Laws and
Regulations for the UAE Missions Abroad, 1983 ("LER").  (See

-4-

Pl.'s Ex. 12.)  His function was to conduct internal auditing of the finances at the cultural attache's office.  His duties included the audit and review of all expenditures and accounting methods of the cultural attache and the educational expenditures for the UAE students in the United States, and reconciliation of all bank statements.  He supervised eight or more accountants and reported directly to the cultural attache.  While employed at the embassy, his salary increases, his promotion, and his annual performance evaluations were authorized under and conformed to the LER.

In late March 1993, El-Hadad took a five-day duly authorized vacation to visit his wife and children, who had remained behind in Abu Dhabi awaiting the end of the school term.  While there, the Deputy HESR Minister asked El-Hadad to stay in Abu Dhabi to help with a pressing need in auditing the worldwide cultural divisions, a function the Ministry had recently undertaken and for which they were short-staffed.  The record in this case includes the written authorization by the Deputy Minister of HESR with the consent of the embassy's cultural attache assigning El-Hadad to work at the HESR Ministry for three months.

Shortly after he returned to Washington, El-Hadad discovered financial improprieties in the embassy's cultural attache's office there.  Specifically, he found a secret account kept and used by the cultural attache and his deputy that four other UAE

-5-

employees – – the chief accountant, two other accountants, and a
driver – – helped maintain.  El-Hadad reported this secret
account to the UAE Assistant Minister of Education, who in turn
informed the Minister of Finance of the UAE's Ministry of Finance
and Industry.  The Minister of Finance personally came to the
United States and met secretly with El-Hadad to discuss what El-
Hadad had discovered.  As a result of this meeting, a team of
three investigators from the UAE's Ministry of Finance and
Industry investigated on-site for ten days in November 1993.  The
official report of the investigation, issued the next month under
the auspices of the Ministry of Finance and Industry, disclosed a
total of three secret accounts used to embezzle UAE state funds
for private use.  It concluded that the cultural attache and his
deputy were fully responsible for the misappropriated funds.
Citing the limited time constraints of their mission and a
deliberate effort by some employees to withhold information, the
report concluded that the full amount of the embezzled funds had
not been determined, but that at least $2 million had been
embezzled.  The report recommended the

> formation of a committee chaired by an Attache employee
> and include the internal auditor, Mohammad El-Hadad and
> Embassy accountant, Mohammad Imad.  Their mission would
> be to correspond with all those institutions [of higher
> education] to request copies of all Attache pertinent
> records.  This would facilitate a clear accounting of
> all the refunds received and those deposited to the
> State treasury account and those that were lost or
> embezzled.

-6-

(Pl.'s Ex. 9, Ministry of Finance and Industry Report, Cultural Attache Auditing, Washington at 24 ¶ 3 ("Investigative Rpt."), Dec. 30, 1993.)  El-Hadad did continue the investigation.  In his 1993 end-of-year work performance evaluation, El-Hadad was rated as an excellent employee, scoring 99 out of a possible 100 points.

In early 1994, as a result of the findings of this internal investigation, the cultural attache and his deputy were relieved of their positions.  In September 1994, the new cultural attache fired the three accountants who had been implicated in the embezzlement.  The new cultural attache rated El-Hadad as an excellent employee in his 1994 year-end evaluation, and recommended him for an annual salary increase, a merit bonus, and a promotion.  (See Pl.'s Exs. 19b, 22.)  The Director of Financial and Administrative Affairs for the HESR Ministry approved a salary increase and promotion.  (See Pl.'s Ex. 24.)

More than a year later, the UAE's State Audit Institution issued its Decision No. 248, "recommend[ing]" that certain disciplinary action be taken against the employees involved in the embezzlement, most of which had already been meted out some sixteen to twenty months earlier.  (Pl.'s Ex. 38, State Audit Institution Decision No. 248 for 1995 ("State Audit Decision No. 248") at 1, Nov. 9, 1995.)  In addition, however, State Audit

-7-

Decision No. 248 recommended that El-Hadad be disciplined, as well:

> e.    1.    El-Hadad, auditor at the Cultural Attache's office, . . . be penalized with administrative dismissal without prior notice and to deny him end-of-service benefits for one year in accordance with Article VII item 17 [sic][1] and Article XIV item 19 [sic][2] of the Local Employees Bylaws for the missions abroad, pursuant to evidence against him of several financial violations as indicated in detail in the investigative memorandum.[3]
>
> 2.    He's liable to refund $1557.95 expensed from the State treasury for healthcare coverage to be deducted from his end-of-service bonus.
>
> > - He's liable to refund $210.17 issued to him erroneously from the State treasury for health care coverage to be deducted from his end-of-service bonus.
> >
> > - Refund of the travel ticket value differential received for a round trip ticket he purchased, Washington - Abu Dhabi, and what he's entitled to for a one-way ticket, Abu Dhabi - Washington to be deducted from his end-of-service bonus.

---

[1]    No such Article and item number in the referenced LER exists.  This error is presumed to be an error in translation from the original report which was written in Arabic to the English language version used at trial.

[2]    See above, note 1.

[3]    The "investigative memorandum" purporting to contain evidence of El-Hadad's "several financial violations" was not submitted as evidence in this action.

-8-

(Id. at 2, Art. II ¶ 4(e).)[4]  A week later, the HESR Minister's

Decision No. 257 was issued dismissing El-Hadad and assessing

certain monetary penalties against him:

> 1.    Dismissal of Mr. Mohammad Salem El-Hadad, auditor
> at the Cultural Division in Washington, without prior
> notice and depriving him from end-of-service
> compensation for one year, in accordance with the Rules
> and Regulations contained in the Local Employees Bylaws
> applicable to the UAE missions abroad, Number 1 for
> 1983, Article VII, Item 17 and Article XIV Item 19.[5]
>
> 2.    The following amounts are to be refunded and
> deducted from the end-of-service compensation due to
> him:
>
> > a.  $1557.96 for family health coverage
> > differential
> >
> > b.  $210.17 for health insurance paid to the
> > employee from the State treasury
> >
> > c.  Pay back the difference of travel expenses for
> > a round-trip ticket Washington - Abu Dhabi and
> > what he's entitled to as one-way travel Washington
> > - Abu Dhabi.[6]

(Pl.'s Ex. 37, Ministerial Decision No. 257 for 1995

("Ministerial Decision No. 257"), Art. III, Nov. 16, 1995.)  Both

State Audit Decision No. 248 and Ministerial Decision No. 257

---

[4]  Additional allegations of financial improprieties were
included in this document, but were not among the reasons
ultimately given in the document effecting El-Hadad's penal
termination.

[5]  See above, notes 1 and 2.

[6]  Additional allegations, not ultimately relied on as the
basis for terminating El-Hadad were included in this document.

-9-

were disclosed to other officials in the UAE Ministries and the embassy in Washington.

The record contains numerous documents that relate to each of the alleged financial improprieties listed in the State Audit Decision No. 248 and the HESR Ministerial Decision No. 257. (See, e.g., Pl.'s Exs. 9, 17, 18, 23, 39 - 70, 75, 85.) These documents demonstrate either that the alleged impropriety was not, in fact, improper or that if there was any fault, it lay elsewhere, such as with the embezzlers El-Hadad had detected and reported in mid-1993. Many of these documents were sent to the State Audit Institution and the HESR Minister or his Director of Financial and Administrative Affairs, to refute the allegations before State Audit Decision No. 248 was issued. Then, after State Audit Decision No. 248 and HESR Ministerial Decision No. 257 were issued, but before the disciplinary recommendations were implemented as to El-Hadad, the UAE's Ambassador to the United States and the new cultural attache each sent multiple letters questioning the decisions, vouching for El-Hadad's integrity, dedication, and competence, and pointing out that the allegations of wrong-doing were not credible in the face of documentary evidence. (See Pl.'s Exs. 71 - 73, 78, 84.) These protests with supporting factual references were sent to the Director of the State Audit Institution and his Deputy, the Minister of HESR, and the Minister of Finance. In particular,

-10-

the new cultural attache referred to the "untenable injustice" of

the recommended discipline against El-Hadad, and concluded that

"it is evident that the State Audit Decision . . . needs further

review of its recommendations especially since some are in clear

violation of the essence and facts of the matter."  (Pl.'s Ex.

71, Letter from Cultural Attache to the Deputy of State Audit

at 3, Nov. 27, 1995.)  The Minister of Finance, whose team had

conducted the 10-day embezzlement investigation in November 1993,

also intervened on El-Hadad's behalf, sending a letter stating

that

> [u]nfortunately the State Audit disregarded our
> recommendation and instead issued a recommendation of
> disciplinary dismissal from work of Mr. El-Hadad
> equating him with those employees who were knowingly
> and premeditatedly embezzling public money for many
> years although the investigation proved that he was not
> involved with them.

(Pl.'s Ex. 74, Letter from Minister of Finance to Minister of

HESR at 2, Dec. 25, 1995.)  In a second letter, the Minister of

Finance provided a point-by-point factual refutation of the

alleged financial violations purportedly justifying El-Hadad's

dismissal and sanctions, and noted that the proposed termination

on the basis of the reasons offered would violate the LER that

governed El-Hadad's employment.  Then, observing that the State

Audit Institution had operated with "subjective attitudes" and

refused to consider "documents which refute the accusations"

against El-Hadad, he stated that "[t]he existing disputes between

-11-

the Cultural Attache in Washington and the Administrative and

Financial Affairs Division at the Ministry of Higher Education

and Scientific Research have directly impacted the case of

Mr. Mohammed El-Hadad[.]  . . .  The evidence of that trend is

abundant, and its [sic] quite clear in the nature of the

accusations leveled against him by the said Division, without any

factual or legal basis." (Pl.'s Ex. 85, Letter from Minister of

Finance to Minister of HESR at 2 ¶ 4, Feb. 25, 1996.)

    These pointed protests emphasizing the absence of factual

basis for imposing discipline on El-Hadad did not alter the HESR

Minister's position.  In early February, his Director of

Financial and Administrative Affairs formally requested the new

cultural attache to "resume action towards the implementation of

the remaining provisions of Decree No. 257" with respect to El-

Hadad. (Pl.'s Ex. 82, Letter from Director of HESR's Financial

and Administrative Affairs to Cultural Attache, Washington,

February 3, 1996.) On February 26, 1996, the new cultural

attache capitulated to the directive of his superior, the HESR

Minister, and issued Administrative Decision No. 29, which

identified four specific instances of alleged financial

impropriety and, with an express reference to the LER, imposed

"disciplinary action without warning" on El-Hadad, effective

retroactively to February 1, 1996. (Pl.'s Ex. 86, Embassy of the

UAE, Cultural Division, Administrative Decision No. 29

-12-

("Administrative Decision No. 29"), Feb. 26, 1996.)
Administrative Decision No. 29 reiterated three of the alleged
financial improprieties that were previously identified in
Decision No. 248 and Decision No. 257, namely, the two claims
relating to health insurance premiums and the claim relating to
reimbursement for a round-trip instead of one-way air fare.  In
addition, it included a monetary penalty for $2837.82 due to
"unjustified overtime" paid to El-Hadad in late 1994 and early
1995.  (Id.)

     El-Hadad immediately appealed his dismissal and monetary
sanctions.  His appeal was forwarded by the Ambassador, who
expressed to the Deputy Chief of Audit the "hope that you will
rectify the injustice done and reinstate Mr. El Hadad's rights
. . . .  Furthermore, Mr. El Hadad's performance has been good,
sincere and honest and had been confirmed by his supervisors at
the Cultural Attache."  (Pl.'s Ex. 87, Letter from the Ambassador
to Deputy Chief Audit, Mar. 20, 1996.)

     From June to August 1996, El-Hadad worked as auditor for the
UAE's military attache.  That employment terminated at the
direction of government officials in Abu Dhabi who viewed it as a
circumvention of the penal termination imposed.  (Defs.' Response
Pursuant to June 16, 2000 Remand Order, Decl. of Fathalla Al-
Meswari ("Al-Meswari Decl.") ¶ 27, Nov. 20, 2000.)  El-Hadad
filed this lawsuit on August 22, 1996.

-13-

Sometime in late summer 1996, HESR's Director of Financial and Administrative Affairs visited the cultural division at the Washington embassy and addressed all twelve to fifteen employees there on the subject of El-Hadad's dismissal. The Director told the employees attending the meeting that El-Hadad had been dismissed because he was not doing his job properly or honestly. (See Trial Tr. vol. 1, 76, June 6, 2005.)

Throughout the latter part of 1996 and into 1997, El-Hadad sought work in and around Washington as an auditor or accountant at various Arab-language embassies and Arab-language private schools when he learned of vacancies in his field. None of these opportunities resulted in an offer of employment. In each interview, he was asked why he left his auditor's job at the cultural division. On one occasion, he described his parting from the embassy as a "disagreement," but the prospective employer called the UAE embassy to learn that El-Hadad had been penally terminated. On another occasion, he showed supportive letters from the UAE Ambassador and the new cultural attache attesting to his competence, integrity, and dedication, but again, he was not offered a position. On still other occasions, after he disclosed the fact of his dismissal, he received neither a follow-up interview nor an offer of employment. In 1997, El-Hadad and his family returned to Egypt. Although he interviewed for accounting and auditing work at hotels, schools, import and

-14-

export businesses and other firms in Egypt, he was always asked about the circumstances under which his prior employment ended, and he was never offered another position.  Ever since he was terminated from the UAE embassy in 1996, El-Hadad has not received a single offer of employment in accounting.  His efforts to secure employment outside his field of expertise failed, as well.  In 1999, El-Hadad started his own business in cosmetics, which lost money, so he closed the business in 2003.  Since being terminated for disciplinary reasons, El-Hadad's reputation as an accountant and auditor has declined, and he has been publicly and privately humiliated and embarrassed due to his unemployment and inability to provide for his family.

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW
ON PARTIES'S CLAIMS AND DEFENSES</u>

I.  SOVEREIGN IMMUNITY FROM SUIT

In their post-trial submission of proposed findings of fact and conclusions of law, defendants argue, as they have previously, that they are immune from El-Hadad's claims by virtue of the Foreign Sovereign Immunities Act ("FSIA").[7]  <u>See</u> 28 U.S.C.

_____

[7]  The issue defendants raise post-trial has been aired and considered multiple times in this case.  In August 1999, Judge Stanley Harris determined that El-Hadad's position as auditor fell within the commercial activity exception of the FSIA. Defendants took an interlocutory appeal, and the issue was remanded for a decision consistent with the D.C. Circuit's opinion.  After Judge Harris' retirement, this court, specifically addressing the material factors identified by the D.C. Circuit, again determined that El-Hadad's position as auditor fell within the commercial activity exception to the

-15-

§§ 1602 et seq.  El-Hadad has asserted that his employment as auditor falls within the commercial exception to the FSIA. Defendants counter that El-Hadad was a civil servant and therefore the commercial exception does not apply.

    A.  Findings of fact

    The UAE, and its Washington embassy, including its cultural division, each qualify as a "foreign state" within the meaning of the FSIA.  Id. § 1603(a).  The cultural attaché's office was responsible for administering the UAE government program to support UAE citizens who were students enrolled in colleges in the United States.  El-Hadad, a citizen of Egypt, was hired by the UAE embassy to serve as an internal auditor of accounts of the cultural attache's office.  In carrying out his duties, he audited and reviewed the expenditures and accounting methods of the cultural attache and the educational expenditures for the UAE students in this country.  He also reconciled all bank statements for the cultural attache's office.  In this position, El-Hadad was promoted and paid in accord with a grade and step salary system.

    The defendants' witness, a legal advisor to the UAE embassy who holds an advanced degree in law, has declared that the United Arab Emirates law does not define the term "civil service" or use

---

FSIA.  The evidence introduced at trial has only reinforced that decision.

-16-

the term "civil servant." (Al-Meswari Decl. ¶ 10). The record in this case contains many documents expressly applying certain provisions of the LER to El-Hadad, yet not one document that expressly applies any civil service law to him. The translated LER itself contains just two references to civil service status, neither of which could apply to El-Hadad, because they are expressly restricted to UAE citizens and El-Hadad is not a UAE citizen. (See LER, Art. 20/2 ("UAE citizens are subject to the system of salaries, compensation, and retirement pay of the civil service employees enacted in the UAE.") & Art. 20/3 ("In the event of classifying a UAE citizen to civil servant, his employment is considered continuous from the time of his appointment as a local employee on the condition that he is not paid the compensation of the end of his service.").) The LER contains no provision that states or suggests that a non-UAE citizen could receive civil service benefits or be classified as a civil servant. A letter from the cultural attache noted that El-Hadad's position as accounting auditor did not have civil service benefits. (See Pl.'s Reply Pursuant to June 16, 2000 Remand Order, Ex. 1, Letter from Cultural Attache, Dec. 9, 1994.)

The characteristics of El-Hadad's activities as an auditor do not bear the earmarks of a civil servant. The record provides no evidence that El-Hadad had any more discretion in conducting his audits or that he executed his duties with any more state

-17-

authority than an external auditor on contract would have had.
El-Hadad had no role in the creation or administration of
government policy.  He was not privy to political deliberations
or government decision-making.  He did not represent or act or
speak for the UAE government in his dealings with others.  His
duties, although important and involving large sums of money,
were ministerial, not discretionary.

    B.   <u>Conclusions of law</u>

    Subject to specific exceptions, the FSIA allows foreign
states immunity from suit in federal and state courts.  28 U.S.C.
§ 1602 <u>et seq.</u>  The FSIA does not recognize a foreign state's
immunity if "the action is based upon a commercial activity
carried on in the United States by the foreign state[.]"  <u>Id.</u>
§ 1605(a)(2).  In this case, "the immunity exception depends
solely on whether the action is based upon a 'commercial
activity[.]'"  <u>El-Hadad v. Embassy of the United Arab Emirates</u>,
216 F.3d 29, 33 (D.C. Cir. 2000).  Thus, "[t]he ultimate question
to be answered is whether El-Hadad's employment constituted
commercial activity."  <u>Id.</u> at 34.  Defendants have the ultimate
burden of persuasion that the exception does not apply.  <u>See El-
Hadad v. Embassy of the United Arab Emirates</u>, 69 F. Supp. 2d 69,
73 (D.D.C. 1999) (citing <u>Princz v. Federal Republic of Germany</u>,
26 F.3d 1166, 1171 (D.C. Cir. 1994)).

    For purposes of the FSIA,

-18-

> A "commercial activity" means either a regular course
> of commercial conduct or a particular commercial
> transaction or act.  The commercial character of an
> activity shall be determined by reference to the nature
> of the course of conduct or particular transaction or
> act, rather than by reference to its purpose.

Id. § 1603(d).  The Supreme Court, observing that the statutory

definition "leaves the term 'commercial' largely undefined," has

identified the key determinant of commercial activities.

Republic of Argentina v. Weltover, 504 U.S. 607, 613, (1992).  "A

foreign state engaging in 'commercial' activities 'do[es] not

exercise powers peculiar to sovereigns"; rather, it 'exercise[s]

only those powers that can also be exercised by private

citizens."  Id. at 614 (quoting Alfred Dunhill of London, Inc. v.

Republic of Cuba, 425 U.S. 682, 704 (1976)).

    In his job at the cultural attache's office, El-Hadad

audited and reviewed expenditures and accounting methods and

reconciled bank statements.  Whether conducting audits and

employing auditors to conduct them constitutes a commercial

exception as defined by the FSIA appears to be a matter of first

impression.  The plain language of the statute, though, easily

guides this determination, just as it has guided other courts

where activity giving rise to suits was activity commonly engaged

in by private parties in commerce or trade.[8]  Audits and auditors

---

    [8]  See, e.g., BP Chemicals Ltd. v. Jiangsu Sopo Corp., 285
F.3d 677, 686 (8th Cir. 2002) (noting that attempts by agents of
a state-owned enterprise to contact American vendors to produce
goods needed to build a plant were "obviously 'commercial' in

-19-

are an integral part of a regular course of commercial conduct.
The orderly conduct of commerce and trade depends on audits and
auditors.  There is nothing about auditing expenditures,
reviewing accounting methods, reconciling bank statements or
employing auditors to conduct these activities that is an
attribute unique to the governance of a sovereign state.  When a
foreign state hires an auditor to conduct an internal audit of
its finances, it is exercising only those powers that can also
be, and routinely are, exercised by private citizens engaged in
commerce.  See Weltover, 504 U.S. at 614.  Thus, the plain
language of the FSIA statute leads to the conclusion that El-
Hadad's employment as an internal auditor of accounts was a
commercial activity, as that term is defined by the FSIA.

_____

character"); Daly v. Castro Llanes, 30 F. Supp. 2d 407, 418
(S.D.N.Y. 1998) ("It can hardly be argued that accepting bank
deposits . . . [on a commercial basis] is not an act of a
commercial character.  Common banking activities are not
ordinarily exclusively within the 'peculiar powers' of a
sovereign, and these activities are precisely the type of actions
by which a private party can be understood to be engaging in
'trade and commerce.'"); Los Angeles News Serv. v. Conus Commc'ns
Co. Ltd. P'ship, 969 F. Supp. 579, 585-86 (C.D. Cal. 1997)
(finding that broadcasting television news by a state-owned
broadcast corporation is a commercial activity under FSIA because
it is the "type of activity customarily carried on for profit by
private individuals and corporations" (internal quotations
omitted)); Walter Fuller Aircraft Sales, Inc. v. Republic of the
Philippines, 965 F.2d 1375, 1384-85 (5th Cir. 1992) (noting that
contracts by a foreign sovereign for goods and services
"typically" satisfy the commercial activity requirement of the
FSIA, and a contract that is "indistinguishable from a contract
entered into between two private entities" is within the
commercial exception).

-20-

Defendants' attempt to take this case outside of the commercial activity exception by characterizing El-Hadad as a "civil servant" is unpersuasive.  The factual record does not establish what a UAE civil servant is or that El-Hadad qualified as a civil servant in the UAE's employ.  Defendants, relying on Kato v. Ishihara, 360 F.3d 106, 109 (2d Cir. 2004), argue that the fact that El-Hadad's salary and promotions were based on a "grade" and "step" salary system and the fact that he took a competitive examination in order to qualify for his first position as a UAE employee, is evidence that he was a civil servant.  (See Defs.' Post-Trial Proposed Findings of Fact and Conclusions of Law ("Defs.' Post-Trial Subm.") at 15.) Defendants' position, however, is not supported by the opinion in Kato.  Rather, that court concluded that when "determining whether a foreign government's employment of personnel in the United States is 'civil service' and therefore 'governmental,' we do not look principally to whether that employment resembles the contemporary civil service of the American democracy, but we instead inquire whether 'the particular actions that the foreign state performs [through that employee] . . . are the type of actions by which a private party engages in "trade and traffic or commerce."'"  Kato, 360 F.3d at 114 (quoting Weltover, 504 U.S. at 614).  The type of services an auditor performs are the type by which a private party engages in trade or commerce.  Moreover,

-21-

a standardized grade/step salary system and a competitive

qualifying examination are features of employment that are by no

means unique to governmental civil service employment, but are

common to employers engaged in private commerce as well.[9]

　　　Defendants have failed to establish facts sufficient to show

that El-Hadad was a civil servant in the UAE's employ.  Because

defendants have not met their burden of showing that El-Hadad's

employment as an auditor is not commercial, defendants' defense

of sovereign immunity fails.

II.  BREACH OF CONTRACT

　　　El-Hadad argues that he had an employment contract for

permanent employment that was governed by the terms of the LER,

and that defendants violated that contract when they dismissed

him on trumped up reasons that had no basis in fact.  Defendants

argue that the employment contract was an at-will contract,

allowing them to terminate El-Hadad at any time for any reason or

for no reason.

---

　　　[9]  Defendants also argue that the fact that El-Hadad did not
sign an employment contract but instead relies on the LER to
establish a contract supports their position that he is a civil
servant.  (Defs.' Post-Trial Subm. at 15-16.)  Defendants do not
explain why the absence of a written contract and El-Hadad's
reliance on the LER tends to indicate that he is a civil servant,
and it is not obvious.  By its own terms, the LER applies to both
civil servants and to others, but the only two references in the
LER to civil servants support a conclusion that El-Hadad, a non-
UAE citizen, was not a civil servant.  (See LER, Arts. 20/2, 20/3
(quoted above).)

-22-

A.    <u>Findings of fact</u>

Before accepting the position in Washington, El-Hadad discussed his employment with the cultural attache and the deputy cultural attache over several weeks.  They told him specifically that his employment would be permanent, which he understood to mean until his death, retirement, or termination for cause.  El-Hadad credibly testified that he would not have given up a secure position and undertaken the expense of moving himself and his family from the UAE to the United States for a position that was not permanent.  Defendants offered no rebuttal on this point.

Due to the prior ten years he spent auditing the accounts of cultural divisions worldwide with the Ministry of Education, El-Hadad was already familiar with the LER.  The LER, by its express terms, governs the hiring, annual pay, salary increases, overtime pay, vacation and other leave, and per diem allowances for approved business travel of local employees in UAE missions abroad.  The LER also specifies the local employee's obligations to his employer and the disciplinary measures the employer is authorized to use for violations of an employee's obligations. El-Hadad knew before accepting the position that the LER would apply to the person hired as the Washington embassy's cultural division's auditor.  El-Hadad's appointing document expressly refers to Article 4 of the LER, which authorizes hiring local employees who are not nationals of the host country, and states

-23-

that "[b]ringing an employee from outside the [host] country
. . . does not alter his status as a local employee.  He is
completely bound by the provisions of the Local Employee
Regulations . . . ."  (LER, Art. 4/6/3.)  El-Hadad's written
yearly performance evaluations identified him as a "local
employee" and precisely conformed to the LER's requirements for
annual employee evaluations.  His pay raises and promotion were
authorized and awarded by express reference to the LER.  And, in
the end, the official documents directing and effecting El-
Hadad's termination expressly referenced authority under the LER.
At the time El-Hadad was appointed and for the duration of his
employment as auditor in the cultural division, both the
defendants and El-Hadad viewed his position as permanent and
intended the provisions of the LER, including the provisions for
termination for disciplinary reasons codified in LER's Article
17, to apply to El-Hadad's employment.  (See LER Art. 17.)

    Defendants penally terminated El-Hadad's employment for the
reasons stated in Administrative Decision No. 29, which expressly
referred to the LER, the State Audit Decision No. 248 and the
HESR's Ministerial Decision No. 257, and identified the following
amounts to be charged against El-Hadad:

    1.   $1577.95   Representing an outstanding amount on
                    his health insurance policy

    2.   $210.17    Representing a payment towards his health
                    insurance premium

-24-

3.    $1225.00  His return airway ticket (Washington - U.A.E.
                - Washington)

4.    $2837.82  Unjustified overtime paid to him for the
                period (October/November/December 94 &
                January 95)

(Administrative Decision No. 29.)

        As to the $1,557.95 for the health insurance policy, this

sum was part of the money embezzled by the cultural division's

chief accountant in the embezzlement scheme that El-Hadad

detected and reported in the first few months of his employment

there, precipitating the termination of the chief accountant and

others involved in the scheme.  The embezzlement scheme

encompassed many angles,[10] one of which related to family health

insurance monthly premiums.  The UAE paid only for the individual

employee's health plan.  An individual employee with a family who

elected family coverage paid the difference out of pocket and

remitted the payment to the chief accountant.  The chief

accountant, however, secretly diverted the money received from

the employees to one of the secret accounts and paid the full

cost of the family health plans from state funds.  (See

Investigative Rpt. at 9, ¶¶ 1.a & 1.b, and at 11, ¶ 4.)  El-Hadad

and other employees, one of whom testified at trial, were

unwitting pawns in this scheme.  (Trial Tr., vol. 1, 96-97,

_____

        [10]  For example, a major part of the embezzlement scheme
involved diverting into one of the three secret accounts refunds
from U.S. colleges and universities when a UAE student withdrew
from courses or from school, which rightly belonged to the UAE.

-25-

June 6, 2005; see also Pl.'s Exs. 40, 41, 46.)  El-Hadad did not
benefit from this scheme.  The scheme long pre-dated El-Hadad's
arrival at the embassy.  He had no role in it except to report it
when he discovered it.  There is no factual basis in this record
for finding that El-Hadad engaged in any wrongdoing with respect
to this sum.

As to the $210.17 for his health insurance premium, it is
undisputed that El-Hadad was entitled either to enroll in
individual health care coverage or receive in lieu of the
insurance a $100 "medical bonus."  (See LER Art. 12; Pl.'s Ex.
85, Letter from Minister of Finance to Minister of HESR at 7-8,
Feb. 25, 1996.)  It is also undisputed that he timely opted for
enrollment in the health insurance benefit, but by mistake was
not enrolled in the first month.  When the error was discovered,
the then-cultural attache authorized a payment of $310.17, the
cost of the premium for an individual for one month.  The $210.17
represents the difference between the cost of the month's premium
and the medical bonus he could have elected, but did not.  (See
Pl.'s Ex. 85 at 7.)  El-Hadad engaged in no impropriety with
respect to this sum.  (See Pl.'s Ex. 71 at 2.)

The facts are not in dispute as to the reimbursement for the
airline ticket.  The Ministry of Finance and Industry authorized
the reimbursement.  (See Pl.'s Ex. 85 at 6; Pl.'s Ex. 71 at 2-3.)
While in Abu Dhabi to visit his family, El-Hadad agreed, at the

-26-

request of the Deputy HESR Minister and with the consent of his
embassy superiors, to stay in Abu Dhabi for a time to help with
audits because HESR was understaffed and El-Hadad had experience
in these audits.  El-Hadad, as a local employee in Washington,
was entitled to a round-trip airline ticket for this official
business.  (See Pl.'s Ex. 85 at 5-6.)  In addition, he was
entitled to a housing and food allowance as well as an additional
per diem allowance.  (See id. at 3-4.)  El-Hadad declined the
food and housing allowance while he worked for the HESR Minister,
and accepted the per diem allowance and the reimbursement for the
round-trip air fare, authorized by the Minister of Finance.  (See
id.)  As the Minister of Finance pointed out to the Minister of
HESR more than two years after the fact when reasons to dismiss
El-Hadad were being developed, El-Hadad received far less than he
was entitled to receive under the rules, and the expense was
sound in light of HESR's pressing need for assistance.  (See id.
at 4.)  The record evidence does not support a conclusion that
El-Hadad misappropriated funds by accepting a duly authorized
reimbursement for a round-trip air fare between Washington and
Abu Dhabi.

Finally, as to the $2,837.82 paid for overtime, the paper
trail leaves no doubt.  The new cultural attache gave written
advance authorization to El-Hadad to work overtime in the months
of October, November, and December 1994 and January 1995.  (See

-27-

Pl.'s Exs. 55, 56.)  El-Hadad credibly testified that, in fact, he worked the overtime hours for which he was paid. Correspondence from the HESR Director of Financial and Administrative Affairs, the same official who told the employees in the cultural division that El-Hadad had not done his job properly or honestly, establishes that the LER permits pay for overtime, provided it is not a duplicative payment for the same hours worked.  (See Pl.'s Ex. 54.)  There is nothing in the record to raise any suspicion of duplicative payments.  The evidence affords no basis for the conclusion that El-Hadad acted improperly in this regard or misappropriated funds paid to him for overtime work.

El-Hadad established by credible testimony that he attempted to mitigate his damages but was unsuccessful.  He has not received any offer of employment in his field of expertise or otherwise.  His attempt at self-employment was unsuccessful as well, as he lost money on his business venture.  The experience of the last decade supports the conclusion that El-Hadad is unlikely to obtain employment and mitigate future damages from this point forward.  Defendants have not shown otherwise.  It is undisputed that El-Hadad earned wages from the UAE in June, July and August 1996 while working for the military attache, but the amount is not in evidence.  Defendants have established that El-Hadad earned income in Egypt when he worked for his own cosmetic

-28-

business.  This income, however, was generated through self-employment in a business that lost money, and thus did not mitigate El-Hadad's damages.

    B.  Conclusions of law

    District of Columbia law presumes that employment contracts are terminable at will unless it is clear that the parties intended otherwise.  Nickens v. Labor Agency of Metropolitan Washington, 600 A.2d 813, 816 (D.C. 1991).  The at-will presumption may be overcome by an oral agreement.  See Hodge v. Evans Financial Corp., 823 F.2d 559 (D.C. Cir. 1987) (holding that statute of frauds did not render an oral contract for permanent employment unenforceable and finding that the evidence established an oral contract for permanent employment); Rinck v. Assoc. of Reserve City Bankers, 676 A.2d 12, 16 (D.C. 1996) (concluding that an employer's statement that an anticipated merger would not result in employee's termination was sufficiently clear and specific to create an enforceable term of the employee's contract and negating the presumption of an at-will contract).  A writing containing specific preconditions that must be met before employment may be terminated is also sufficient to overcome the presumption of an at-will contract.  See Rinck, 676 A.2d at 16 (citing Washington Welfare Ass'n v. Wheeler, 496 A.2d 613, 616 (D.C. 1985)); accord Strauss v. Kaiser Foundation Health Plan of Mid-Atlantic, 744 A.2d 1000, 1011 (D.C.

-29-

2000) (citing <u>Nickens</u>, 600 A.2d at 816, and <u>Washington Welfare</u>
<u>Ass'n</u>, 496 A.2d at 616).  A general reference, either written or
oral, to "permanent employees," or general discussions of reasons
for termination are not sufficiently specific, though, to
establish that the parties intended something other than an at-
will contract.  <u>See</u> <u>Rinck</u>, 676 A.2d at 16 (citing <u>Perkins v.</u>
<u>Gov't Employees Federal Credit Union</u>, 653 A.2d 842, 843 (D.C.
1995)).

Under District of Columbia law on employment contracts, the
first question for the fact-finder in this case is whether the
LER's provisions governing termination are sufficiently specific
with respect to required preconditions to overcome the
presumption of at-will employment and to create enforceable terms
of the employment contract.  <u>See</u> <u>Washington Welfare Ass'n</u>, 496
A.2d at 615, 616.  The LER imposes the following specific
preconditions for a disciplinary termination:

> The employee may be dismissed for disciplinary reasons
> without notice in the following circumstances:
>
> 17/7/1:    If the violations committed severely impact[]
>            the Mission's interest.
>
> 17/7/2:    Destruction of valuables due to dereliction
>            of duties resulting in substantial loss to
>            the Mission.  (Article 18/8 [sic]).[11]

---

[11]    The reference to Article 18/8 appears to be a
typographical error in translation.  There is no Article 18/8,
and Article 16/8 states the corresponding employee obligation to
"[p]rotect the financial interests of the Mission and its
property."

-30-

17/7/3:    Violation of duties as described in Article
           16/9 concerning preservation of official
           documents and the [secrecy][12] of their
           contents.

17/7/4:    Violates the conduct code or harms the
           Mission's ethical reputation (Article 16/10).

17/7/5:    Repetition of an earlier violation for which
           he received a warning (Article 17/5).

(LER, Art. 17/7.)  These provisions are specific enough to
establish preconditions without which dismissal for disciplinary
reasons without notice would constitute a breach of the terms of
the employment contract.  El-Hadad's employment contract with the
UAE embassy was not an at-will contract.

     The second question for the fact-finder is whether
defendants established any of the preconditions for dismissal for
disciplinary reasons without notice or whether, as El-Hadad
claims, the defendants breached the employment contract when they
terminated him and assessed certain monetary penalties against
him.  The defendants gave four specific reasons for firing El-
Hadad in Administrative Decision No. 29.  The abundant
documentary record evidence, most of which was created
contemporaneously with the alleged financial improprieties,
convincingly refutes each allegation of impropriety.  The
evidence establishes that the defendants' four stated reasons for

---

     [12]  The translated text provided to the court uses the term
"secretary," but it is presumed that this word is a typographical
error in translation and the intended word is "secrecy."

-31-

dismissing El-Hadad without notice for disciplinary reasons were
at least false, and were at worst pretextual.  Under these
circumstances, El-Hadad's dismissal constituted a breach of his
employment contract.

El-Hadad is entitled to ordinary damages resulting from
defendants' breach of contract.  "The plaintiff in a contract
action 'is not required to prove the amount of his damages
precisely; however the fact of damage and a reasonable estimate
must be established.'"  Hodge, 823 F.2d at 570 (quoting W.G.
Cornell Co. v. Ceramic Coating Co., 626 F.2d 990, 993 (D.C. Cir.
1980)).  Any award is subject to a discount for mitigation.[13]

> The measure of damages in an employee's action against
> his employer for breach of the employment contract is
> generally the compensation "that would have been due to
> the employee during the unexpired period of employment
> with appropriate reduction to present worth."  . . .
> This prima facie evidence entitlement, though, is
> subject to the defense of mitigation of damages:  "If
> the employee has obtained a substitute job, or could
> obtain one by reasonable effort, he is chargeable with
> the income he obtains or reasonably could obtain in
> this fashion, but only if the employer sustains the
> burden of proving these facts."

Hodge, 823 F.2d at 569 (quoting District of Columbia v. Jones,
442 A.2d 512, 524 (D.C. 1982) (quoting D. Dobbs, Law of Remedies
§ 12.25 at 924-25 (1973)) (citations omitted)).  Although
defendants established that El-Hadad mitigated his damages

---

[13]  Plaintiff is also entitled to consequential damages
resulting from the breach, but none have been pled.  See Hodge,
823 F.2d at 570.

-32-

through his work with the military attache in the summer of 1996,
they have not established the amount of mitigation.

El-Hadad is entitled to damages consisting of lost wages,
including estimated annual pay increases added to his base
salary, the cash equivalent of benefits provided pursuant to the
terms of the LER, end of service compensation as authorized by
the LER, and unused vacation leave until retirement age, which
the LER sets at age 65.  El-Hadad was fired approximately twenty-
three and one-half years before his 65th birthday.

Defendants do not challenge plaintiff's damages
calculations.  Plaintiff's damages submission is based on a
twenty-five year projection, rather than a twenty-three and one-
half year projection.  Thus, it overestimates the damages by
about six percent.  It also appears to double-count wages for
certain periods.  Specifically, El-Hadad's February 1996 salary
is already included in the base salary calculation.  (See Pl.'s
Post-trial Proposed Findings of Fact and Conclusions of Law,
¶ 111).  However, plaintiff's submission then counts again a
month's pay for February 1996, for which El-Hadad worked but was
not paid, because he was terminated late in February effective
retroactively to the first day of the month.  In addition,
plaintiff's submission includes a month's pay to cover a 30-day
notice of termination to which plaintiff asserts he was entitled.
(See id., ¶¶ 114 - 115.)  El-Hadad is not due a month's salary

-33-

for notice of termination if he is to be compensated as if he had not been terminated, which is the premise on which the damages calculation is based.  Plaintiff's contract damages calculation has been adjusted downward accordingly, resulting in a figure of $1,245,961.[14]

Under District of Columbia law, "the court has ample discretion to include prejudgment interest 'as an element in the damages awarded, if necessary to fully compensate the plaintiff.'"  <u>Federal Marketing Co. v. Virginia Impression Products Co., Inc.</u>, 823 A.2d 513, 532 (D.C. 2003) (quoting D.C. Code § 15-109).  <u>See also</u> D.C. Code § 05-109; <u>Duggan v. Keto</u>, 554 A.2d 1126, 1140 (D.C. 1989) (interpreting D.C. Code § 15-109).  "The purpose of awarding prejudgment interest as part of the damages for breach of contract is to compensate the creditor for the loss of the use of money over time.  . . .  The court should usually award such 'delay damages' in such cases 'absent some justification for withholding such an award.'"  <u>Fed. Marketing Co.</u>, 823 A.2d at 531-32 (quoting <u>Gen. Motors Corp. v. Devex</u>

_____

[14] This calculation is comprised of three components:  (1) the salary El-Hadad was making when dismissed, plus an estimated annual increase of $1,200 each year for twenty-three years, and the cash equivalent of the health premium fringe benefit for the employed individual, amounting to $1,147,296; (2) the unused vacation leave for which El-Hadad was not compensated, amounting to $4,496; (3) the end of service compensation calculated to the point in time at which he was dismissed ($8,574) plus the end of service compensation he would have earned on his salary had he worked as projected until age 65 ($85,595), amounting to $94,169.

-34-

Corp., 461 U.S. 648 (1983))(internal citations omitted).  The
rate of prejudgment interest to be applied in this case is
specified in D.C. Code § 28-3302(c).  See D.C. Code §§ 15-109,
28-3302(c).  Accordingly, in order to be made whole, El-Hadad is
entitled to prejudgment interest at the statutory rate specified
in § 28-3302(c) on the damages representing the wages and
benefits that El-Hadad would have received, if he had not been
terminated, from February 1, 1996 to the date the award is paid.

III. DEFAMATION

El-Hadad has sued for defamation and urges this court to
adopt a compelled self-publication theory of defamation.
Defendant UAE relies on a defense of privilege to El-Hadad's
evidence of slander and a defense of no publication to El-Hadad's
evidence of libel.

A.  Findings of fact

Defendant UAE made false and defamatory statements about El-
Hadad that were memorialized in multiple documents, including
State Audit Decision No. 248 and HESR Ministerial Decision No.
257.  It is evident from the face of those two documents, and it
is uncontested, that these documents were published to persons
other than the defamed person himself.  In addition, after El-
Hadad was fired, the Director of HESR's Financial and
Administrative Affairs told several employees in the cultural

-35-

division at the Washington embassy that El-Hadad had been
dismissed because he was not doing his job properly or honestly.

Prior to his dismissal, El-Hadad had been continuously
employed in his profession and judged to be an excellent and
exemplary auditor.  Ever since he was fired by defendants, he has
not had a single offer of employment in his chosen profession.
His efforts to find employment have been frustrated by the fact
that he was dismissed for dishonesty, a trait incompatible with
his profession as auditor and accountant, and a fact he is
compelled to disclose at each job interview or risk demonstrating
a lack of candor if he declines to disclose the fact and then it
is discovered.  This Hobson's choice forces El-Hadad, in effect,
to republish the defamation.

For the past ten years, El-Hadad has been deprived of the
satisfaction of work in his chosen profession and deprived of
enjoying the respect he was accorded for his work and for being
gainfully employed.  He has been unable to take pride in
providing for his family as expected or to realize the
satisfaction and fulfillment of giving his children the
advantages in life he had reasonably hoped to give them.
Instead, he has had to suffer the private and public
embarrassment of relying on others for his own welfare rather
than providing for theirs.  There is no basis to expect that his

-36-

future employment prospects will be materially different from his
experience in the past decade.

B.    Conclusions of law

To prove defamation in the District of Columbia, a plaintiff
must prove

> "(1) that the defendant made a false and defamatory
> statement concerning the plaintiff; (2) that the
> defendant published the statement without privilege to
> a third party; (3) that the defendant's fault in
> publishing the statement amounted to at least
> negligence; and (4) either that the statement was
> actionable as a matter of law irrespective of special
> harm or that its publication caused the plaintiff
> special harm."

Oparaugo v. Watts, 884 A.2d 63, 76 (D.C. 2005) (quoting Crowley

v. North Am. Telecomms. Ass'n, 691 A.2d 1169, 1173 n.2 (D.C.

1997)); see also, Restatement (Second) Torts ("Restatement")

§ 558 (1977).  The factfinder determines the truth or falsity of

the alleged defamation and, if it is false, whether the statement

is defamatory.  See Liberty Lobby, Inc. v. Anderson, 746 F.2d

1563, 1577 (D.C. Cir. 1984), rev'd on other grounds, 477 U.S. 242

(1986).  A statement is defamatory if it "'tends to injure

plaintiff in his trade, profession or community standing, or

lower him in the estimation of [his] community.'".  Olinger v.

Am. Sv. & Loan Ass'n, 409 F.2d 142, 144 (D.C. Cir. 1969) (quoting

Afro-American Publ'g Co. v. Jaffe, 366 F.2d 649, 654 (D.C. Cir.

1966)).  See also Restatement § 559 (defining defamatory

communications).

-37-

Written or broadcast defamation is known as libel.  <u>See</u>
Restatement §§ 568(1) & 568A.  Spoken defamation that is not
broadcast is known as slander.  <u>See id.</u> § 568(2).  Libel is
defamation <u>per se</u>, regardless of the nature of the false and
defamatory statements.  <u>See id.</u> § 569.  Slander constitutes
defamation <u>per se</u> if the nature of the slander concerns a matter
that is incompatible with the profession of the person slandered.
<u>See id.</u> § 570(c).  Whether a defamatory statement identifies a
trait or characteristic incompatible with a profession is a
determination for the factfinder to make.  <u>See id.</u> § 615(2).

Defamation <u>per se</u> renders a defendant liable for general
damages even where no special damages are proved.  <u>See id.</u> § 569
cmt. b.  Special damages differ from general damages in that
special damages relate to the loss of things that have economic
or pecuniary value.  <u>See id.</u> § 575 cmt. b.  General damages are
not limited to things with economic value, but also include
impairment to reputation and standing in the community, personal
humiliation, mental anguish and suffering.  <u>See id.</u> § 621 cmt. b;
<u>see also</u>, <u>e.g.</u>, Minn. Prac. Civ. Jury Instruction Guides § 50.50;
NY Pattern Civil Jury Instructions § 3:29.  Where a plaintiff is
neither a public official nor a public figure, and where the
defamatory statements involve no issue of general public
importance, proof of defamation <u>per se</u> entitles the injured party
to presumed general damages, that is, the general damages may be

-38-

presumed and do not have to be proved.  See <u>Dun & Bradstreet,</u>

<u>Inc. v. Greenmoss Builders, Inc.</u>, 472 U.S. 749, 757, 760-61, 763

(1985) ("We conclude that permitting recovery of presumed and

punitive damages in defamation cases absent a showing of 'actual

malice' does not violate the First Amendment when the defamatory

statements do not involve matters of public concern.").[15]

Because El-Hadad was a private, not public, individual and the

statements at issue did not involve a matter of general public

interest, proof of defamation <u>per se</u> would entitle El-Hadad to

presumed general damages.[16]

The factfinder determines the amount of the plaintiff's

general damages, whether presumed or proved.  See Restatement

---

[15]  Punitive damages against a foreign state are not
permitted under the FSIA.  See 28 U.S.C. § 1606; see also Order,
September 23, 2002, granting defendants' motion for summary
judgment as to punitive damages in this matter.

[16]  In other cases distinguishable from this one because
they implicated First Amendment concerns, the Supreme Court found
that the Constitution prohibited recovery of damages for
defamation <u>per se</u> absent certain findings.  In <u>Gertz v. Robert
Welch, Inc.</u>, 418 U.S. 323 (1974), the Court held that the
Constitution required proof that the publisher was at least
negligent and proof of actual damage if the defamatory statements
involved a subject of general public importance.  And, in <u>New
York Times Co. v. Sullivan</u>, 376 U.S. 254, 280 (1964), the Court
required in cases where the plaintiff was a public official and
the defamatory statements involved a matter of public or general
interest, proof that the publisher made the statement with
"'actual malice' – – that is, with knowledge that it was false or
with reckless disregard of whether it was false or not."  Neither
of these cases states rules applicable to this case, which does
not raise heightened First Amendment concerns and involves
neither a public figure nor defamatory statements on a subject of
general public interest.

-39-

§ 616. Awards for injury to reputation, humiliation and mental anguish are not susceptible of precise estimation and proof, which is the very reason the common law historically permitted the damage from defamation <u>per se</u> to be presumed. "[S]tatements that are defamatory <u>per se</u> by their very nature are likely to cause mental and emotional distress, as well as injury to reputation, so there arguably is little reason to require proof of this kind of injury either." <u>Carey v. Piphus</u>, 435 U.S. 247, 262 (1978) (discussing the doctrine of presumed damages in the common law of defamation <u>per se</u>). "[T]he experience and judgment of history [shows] that proof of actual damage will be impossible in a great many cases where, from the character of the defamatory words and the circumstances of the publication, it is all but certain that serious harm has resulted in fact." <u>Dun & Bradstreet</u>, 472 U.S. at 760 (quotations and citation omitted). Factors considered in determining the amount of presumed damages include the reputation of the defamed party prior to the defamation, the probable as well as proved effect of the defamation on his profession, how widely the defamation was disseminated, the duration of the effect of the defamation, and whether there has been a timely and effective retraction and apology, but the motive and purpose of the publisher is not to be considered in presumed damages. <u>See</u> Restatement (First) of Torts § 621 cmt. c (1938).

-40-

In establishing a basis for dismissing El-Hadad, the UAE made written statements to the effect that El-Hadad had committed financial violations warranting penal termination. The record evidence demonstrates that these statements are false. They are also defamatory on their face in that they tended to expose El-Hadad to contempt, injure him in his accounting profession, and lower him in the estimation of the community of Arab-language embassies in Washington D.C. and his home community in Egypt. These false and defamatory statements were memorialized in multiple documents, including State Audit Decision No. 248 and HESR Ministerial Decision No. 257. These two documents were published to persons other than the defamed person himself. <u>See</u> Restatement § 577 cmt. i ("The communication within the scope of his employment by one agent to another agent of the same principal is a publication not only by the first agent but also by the principal and this is true whether the principal is an individual, a partnership or a corporation."). The UAE did not raise any defenses as to the publication of these two documents.[17] Officials in the UAE goverment to whom the defamatory statements were published included the HESR Minister, his Deputy, and his Director of Financial and Administrative

---

[17] Defendants correctly argue that plaintiff failed to establish that Administrative Decision No. 29 was ever published to a third person, but are silent as to any defense with respect to State Audit Decision No. 248 and HESR Ministerial Decision No. 257.

-41-

Affairs, and the State Audit Institution's Head and his Deputy.
These same UAE officials had been informed that the documentary
evidence did not support a conclusion that El-Hadad had engaged
in financial improprieties.  They had been informed by multiple
sources from the UAE embassy in Washington as well as the
Minister of Finance in Abu Dhabi, both orally and in writing, and
both before and after the libel issued.  They had been supplied
with the pertinent documentary evidence on multiple occasions
from various sources.  In the face of this evidence, the UAE
persisted in the libel.  The UAE's conduct in this regard
constitutes more than negligence.  It constitutes at least a
reckless disregard for the truth, if not clear knowledge that it
was publishing false statements.  Defendant UAE libeled El-Hadad,
which constitutes defamation per se and entitles El-Hadad to
presumed general damages.  See Dun & Bradstreet, 472 U.S. at 763;
Restatement §§ 569, 621; Restatement (First) of Torts § 621.

     Several months after El-Hadad had been fired, the HESR
Director of Financial and Administrative Affairs told several
employees in the cultural division in Washington that El-Hadad
had been terminated because he was not doing his job properly or
honestly.  The Director's statement was false and defamatory and
the Director published it to others.  See Restatement § 577
cmt. i.  Because the Director was one of those persons who had
been informed that the allegations of El-Hadad's dishonesty had

-42-

no factual support (see Pl.'s Exs. 39, 81), and because the
Director reported to and took direction from his superiors who
had been so informed (see Pl.'s Exs. 73, 74, 75, 76, 84, 85), the
Director acted with at least reckless disregard for the truth in
making his statement impugning El-Hadad's competence and honesty.
Dishonesty, and perhaps incompetence, is a matter that is
incompatible with the profession of accountant or auditor,
rendering the Director's slander defamation per se.  See
Restatement § 570(c).

     Defendant UAE asserts a "common interest" privilege defense
as to the Director's slander.

> To come within the protection of the "common interest"
> privilege, the statement must have been (1) made in
> good faith, (2) on a subject in which the party
> communicating has an interest, or in reference to which
> he has, or honestly believes he has, a duty to a person
> having a corresponding interest or duty, (3) to a
> person who has such a corresponding interest.

Moss v. Stockard, 580 A.2d 1011, 1024 (D.C. 1990); see also
Restatement § 596.  For example, a partner in a partnership is
entitled to know why an employee of the partnership was
terminated.  See Restatement § 596 cmt. c.  The defendant bears
the burden of proving the privilege.  See id. § 613 cmt. i.

     Here, the UAE has not articulated the nature of the common
interest it claims.  It is not obvious that all the employees in
the cultural division had, or that the Director believed they
had, a legitimate interest that corresponded to the UAE's

-43-

interest in the basis for El-Hadad's dismissal.  See Moss, 580
A.2d at 1024.  A meeting held several months after the fact "for
the specific purpose of alerting the staff of the termination"
(Def.'s Proposed Findings of Fact and Conclusions of Law at 40)
does not establish that all recipients of the published
defamatory statements shared a legitimate and reciprocal common
interest in knowing that the reason for El-Hadad's termination
was that he was not doing his job properly or honestly.  See
Restatement § 596 (discussing the common interest privilege).

      In addition, the common interest privilege applies only to
statements made in good faith, which does not describe this
situation.  See Washburn v. Lavoie, 357 F. Supp. 2d 210, 213 n.4
(D.D.C. 2004) (quoting Moss, 580 A.2d at 1024).  The common
interest privilege does not sanitize the publication of
statements made with reckless disregard for their falsity.  Even
if the UAE had identified a legitimate common interest, the
privilege's protection was lost because the Director spoke to the
employees either with knowledge that the statements were false or
with reckless disregard as to the falsity of the matter.  See
Restatement §§ 595 cmt. a, 600-602.

      Plaintiff argues that this court should recognize the theory
of compelled self-publication in this instance.  The theory of
compelled self-publication holds that when, as here, the
defendant has put the plaintiff in the position of having no

-44-

choice but to repeat the defamatory statements in order to either defend himself or mitigate his damages, the defendant should be liable for the publication, even though it came from the mouth of the plaintiff.  While some courts permit compelled self-publication to establish a claim for defamation, it is not a widely accepted theory.  See Atkins v. Indus. Telecomms. Ass'n, Inc., 660 A.2d 885, 895 (D.C. 1995) (explaining that the self-publication theory has not been widely accepted).  The question in the District of Columbia apparently remains open.[18]  Under these circumstances, where the UAE is liable for defamation per se and El-Hadad's recovery would be the same even if this jurisdiction recognized the theory of compelled self-publication, there is no need to predict whether the District of Columbia would adopt the theory.

El-Hadad has proved defamation per se and is entitled to recover general presumed damages.  See Dun & Bradstreet, 472 U.S. at 763.  While he is not entitled to recover any damages that duplicate the contract damages awarded, he is entitled to recover that portion of general damages for the defamation per se that is

---

[18]  See Vitikacs v. The American Legion, No. 02-CA-0202, 2003 WL 22004935, *4 (D.C. Super. June 8, 2003) ("The Court need not decide at this time whether under District of Columbia law a defamation claim can be based upon a theory of compelled self-publication  . . . .  If [plaintiff] is able to present evidence of a compelled self-publication of the discharge letter, then the Court will decide the legal question of whether such alleged self-publication is sufficient to state a claim of defamation under District of Columbia law.").

-45-

not compensated by the contract damages award, including
humiliation, embarrassment, mental anguish, and injury to
reputation.  See Restatement § 621.  Although El-Hadad is
entitled to presumed damages, he has offered evidence to prove
damages for loss of reputation and standing in his professional
community, as well as humiliation and mental anguish.  The UAE
has not offered any evidence to rebut El-Hadad's testimony in
this regard.

Defendants' conduct destroyed El-Hadad's professional life
almost 24 years before his retirement age.  El-Hadad seeks an
additional $500,000 for injury to his good name and reputation,
for the related mental anguish, distress and humiliation, and for
any related monetary loss.  El-Hadad's professional reputation
before the defamation had been stellar and since the defamation,
he has been unable to secure any employment in his profession.
The defamation has followed, and will follow, El-Hadad wherever
he goes in search of employment.  The humiliating effects of the
defamation have already lasted ten years, and there is no reason
to expect a change.  An early retraction and apology might have
limited the damage, but there was no timely retraction or apology
from the UAE.  In light of the devastating effect of the
defamation on El-Hadad's professional life and the related
ignominy and humiliation he has suffered undeservedly, $500,000

-46-

in presumed general damages for injury to reputation and related

mental anguish, distress and humiliation is warranted.[19]

CONCLUSION

The parties intended the LER, with its specific

preconditions for terminating the employment contract, to apply

_____

[19] An examination of reported jury awards in defamation
cases demonstrates that an award here of $500,000 in presumed
damages is reasonable especially since El-Hadad has proven
approximately $1 million in actual damages for wrongful
termination and defamation. Cf., e.g., O'Lee v. Compuware Corp.,
2005 WL 2428694 (Cal. Super.) (reporting, in a wrongful
termination and defamation case, an award of $500,000 presumed
damages for each of two plaintiffs, in addition to actual damages
proved in the amount of $100,000 for one plaintiff and $50,000
for the second plaintiff, as well as $3.45 million in punitive
damages for each plaintiff); Rice v. Grava, 1997 WL 33349455
(Tex. Dist.) (reporting jury award of $1,250,000 presumed damages
for slander per se and $105,000 for breach of employment
contract); see also Frederick v. Fried, 2002 WL 31887353 (N.Y.
Sup.) (reporting jury award of $500,000 in general, apparently
presumed, damages for plaintiff in action for slander per se by
former business partner injuring plaintiff, an attorney, in his
profession); Rouse v. Bicker, 2002 WL 32158043 (Cal. Super.)
(reporting $175,000 jury award in compensatory (actual and
presumed) damages and $1 in punitive damages for slander per se
for a co-owner of a taxi cab company who was forced to resign
from board of directors but later reinstated when truth was
revealed); Schauer v. Thornton, 2000 WL 33957519 (Wis. Cir.)
(reporting jury award of $500,000 for presumed damages and
$150,000 in punitive damages for slander per se by former
employer of plaintiff, as well as another $500,000 in damages for
invasion of privacy); (Larsen v. Hapco Farms, 2000 WL 3410951 (D.
Idaho) (reporting $11.2 million presumed general damages jury
award for Idaho potato grower who sued a business partner for
libel when partner accused plaintiff of fabricating evidence that
partner had mislabeled other potatoes as Idaho potatoes which
resulted in the Idaho Potato Commission fining partner); Roland
v. Velur, 1999 WL 619526 (Cal. Super.) (reporting $1,000,000 jury
award for plaintiff for loss of reputation, loss of sales,
general and presumed damages, after a business competitor
slandered plaintiff to employees of plaintiff's sales force).

-47-

to El-Hadad's employment at the embassy.  The reasons offered by defendants to satisfy the preconditions for terminating El-Hadad under the LER were false and likely pretextual.  Therefore, defendants breached the employment contract.  El-Hadad attempted to mitigate his damages, but was unsuccessful.  The UAE libeled El-Hadad, constituting defamation <u>per se</u>.  The UAE also slandered El-Hadad concerning a matter that was incompatible with his profession, again constituting defamation <u>per se</u>.  Accordingly, defendants are liable to El-Hadad for contract and tort damages in the amount of $1,745,961 plus prejudgment interest at the statutory rate on the contract damages due and owing El-Hadad from February 1, 1996 through the date of payment of the damages.

A final judgment accompanies this memorandum opinion.

SIGNED this 29th day of March, 2006.

_____/s/_____
RICHARD W. ROBERTS
United States District Judge